```
        IN THE UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF ARKANSAS
                FAYETTEVILLE DIVISION
```

JIM MOREY                                          PLAINTIFF

       v.               Civil No. 10-5213

CHIAPAS ORGANIC SERVICES, INC.
and CHIAPAS ORGANIC HOLDINGS, INC.                 DEFENDANTS

CHIAPAS ORGANIC SERVICES, INC.                     COUNTER-CLAIMANT

       v.

JIM MOREY                                          COUNTER-DEFENDANT

## MEMORANDUM OPINION

On the 29th day of March, 2012, the captioned matter came on for trial to the Court. Plaintiff appeared in person, and was represented by counsel. Defendants appeared through their representative, Sergio Montemayor[1], and were represented by counsel. The Court heard the testimony of witnesses Dean Harris, Jim Morey, and Sergio Montemayor, and received documentary evidence, and now makes the following findings of fact and conclusions of law:

### Procedural Background

1. Plaintiff Jim Morey ("Morey") sued defendants Chiapas Organic Services, Inc. ("COS") and Chiapas Organic Holdings, Inc.

---

[1] At the time of trial, Montemayor was a part-time consultant for COH, and he did not know whether appropriate corporate action had been taken to authorize his appearance on a consulting basis as corporate representative for COH and COS. Although Montemayor testified during depositions as the corporate representative of both COH and COS, he was formally employed only by COH. His paychecks, however, were written on a CGO account.

("COH") for breach of a written employment contract (the "Employment Agreement").[2] COS counterclaimed, alleging that Morey had breached his fiduciary duty, breached the Employment Agreement, and converted COS property.

2.  Morey moved for summary judgment on his breach of contract claim, and the Court found that defendants had breached the Employment Agreement when they ceased paying Morey his salary, and later re-commenced paying it at half the agreed amount.

The evidence was not sufficient, on summary judgment, to determine the amount of damages for breach, and that issue was left for determination at trial.

## Facts

3.  The evidence at trial showed that COH is a holding company incorporated for the purpose of holding the stock and coordinating the operations of two subordinate entities, COS and Chiapas Granjas Organicas, S.A.P.I. de C.V. ("CGO"). CGO is a farming operation located in Chiapas, Mexico. COS is the entity created to distribute CGO produce in the United States. All three companies -- COH, COS, and CGO -- did business under the brand "Chiapas Farms."

4.  Chiapas Farms was the creation of venture capitalist Sam Fairchild ("Fairchild") and Javier Velez Bautista ("Velez").

---

[2] Other asserted claims -- for breach of the covenant of good faith and fair dealing, promissory estoppel, and unjust enrichment -- were dismissed by Order dated January 25, 2011.

Velez was CEO (sometimes he referred to himself as President) of both COH and COS. Sergio Montemayor ("Montemayor") was CFO of COH, but managed financial affairs for all three companies.

5. Morey, whose background was in operations management -- both for Walmart and as an independent consultant -- was tapped by Fairchild to assist in developing the Chiapas Farms companies from the ground up. Morey saw huge opportunities in the fledgling companies, and invested not only time but money in their development.

6. In August, 2008, Morey was offered the position of Vice President and General Manager of U.S. Operations for COS. Morey, COS, and COH entered into the Employment Agreement, which became effective October 1, 2008, memorializing their relationship.

7. The Employment Agreement is a tripartite contract between Morey, COS, and COH. Its terms were negotiated by Morey and Fairchild, and the document was drafted by a lawyer in the pay of defendants. In it, Morey agreed to assume responsibility for all U.S. operations of COS, and to protect the business information of COS, COH, and "any of their respective subsidiaries or affiliates" (referred to in the Employment Agreement as "the Employer Group") in the event of his termination.

Morey was to be compensated with a base salary of $220,000 per year, performance bonuses and expense reimbursements, and 1.25 days paid vacation per month, but the Employment Agreement is

silent as to which entity will fund these types of compensation. Morey was also to receive specified remuneration from both COS and COH, as outlined below.

8.  COS, which is defined as "the Employer" in the contract, agreed to provide Morey with a cell phone and group heath and dental insurance benefits for him and his family.

9.  COH, which is defined as "the Holding Company" in the contract, agreed to issue stock to Morey.  It agreed to issue, within ninety days of the execution of the Employment Agreement, 500,000 shares of Class B Common Stock "as compensation for services previously rendered."  It further agreed that no later than December 31, 2008, it would issue an additional 264,000 such shares as "incentive" to Morey "to continue his employment" with COS.  These shares would vest in three equal installments, on October 1 of 2009, 2010, and 2011, unless Morey was terminated by COS without cause, in which case the shares would automatically vest upon Morey's receipt of notice of termination.

10.  The Employment Agreement was terminable for any reason by Morey or COS upon thirty days' notice.  In addition, COS could terminate Morey "for just cause, including, but not limited to, any willful breach of duty."

11.  The Employment Agreement was governed by Arkansas law, and could not be modified except by written agreement of the parties.

12. Also effective October 1, 2008, COS and COH entered into a contract with Dean Harris ("Harris") to serve as "Director of U.S. Operations," although the contract did not specify whose operations these were. The terms of Harris' contract are very similar to those of Morey's.

13. On or about October 1, 2008, Morey opened the United States office for COS, and began to carry out his duties. For reasons unrelated to his skill or dedication, however, the business did not prosper. Money was tight, and was often transferred from COH to COS, or from COS to COH or CGO, to pay bills or cover shortfalls. For example, on December 1, 2008, Morey transferred $12,000.00 from COH to COS to pay payroll, rent, and insurance. In April, 2009, Montemayor directed Morey to write a check out of the COH "payables account" to a CGO account "because it was overdrawn." On June 29, 2009, Montemayor instructed Morey to send all but $2,000.00 from the COS account to the COH account, even though that would not leave enough money in the COS account to make payroll. On September 9, 2009, Morey asked Montemayor if he could "pay down my COH Visa credit card" so he could pay travel expenses to go to a trade show. On October 29, 2009, Morey e-mailed Montemayor asking that money be transferred to the COS account to make an insurance payment.

While Montemayor testified that monies flowing from COS to COH and CGO were to pay for product, and that monies flowing from

COH to COS were loans, there is no paper evidence of this whatsoever, and it is clear that COH kept COS entirely in the dark about all bookkeeping and accounting issues. This secrecy completely undermines Montemayor's credibility on the topic.

14.  In mid-2009, Morey received a telephone call telling him that payment of his salary was going to be deferred. It is not entirely clear who conveyed this information to him, but Javier Velez ("Velez"), President of both COH and COS, stated in a letter to Morey dated July 15, 2010, that "[m]anagement of Chiapas Organic Holdings directed you in June last year that all Chiapas Farms executives would be paid 50% of their salaries, and that you and Dean Harris should do so from that point forward, as the rest would be paid in stock."

15.  From May 29, 2009, until September 15, 2009, neither Morey nor Harris received any salary or insurance reimbursement. At that point, they began receiving payments of half their salaries. Neither man was happy about this situation, and many e-mails were exchanged between them and Montemayor and Velez, asking when full salary and insurance reimbursement would resume.

16.  On August 11, 2009, Harris contacted Montemayor for information about when he might get paid.  Montemayor responded "[w]e may be able to start paying you the equivalent of one half payroll period starting this pay period, and to continue that way for several pay periods, till funding from investors reach certain

levels.  Afterwards, we would go back to full pay period payments and program payment of prior payroll period differences."

17.  On August 14, 2009, Morey sent Montemayor an e-mail asking if he could start paying Harris his full salary on August 31, 2009.  Montemayor responded that he did not think it "likely that the larger investors will have come in by then."

18.  On September 14, 2009, Montemayor advised Morey by e-mail that "we can start half payroll for you.  Pls. confirm amounts before writing checks so that I can make sure enought $ is available in the account."

19.  On October 6, 2009, Morey e-mailed Velez, asking "[p]er our last conversation in July are we still on track to resume full pay and collect our back pay this month. . . . Any updates would be appreciated."  Velez responded "[w]hen we resume paying full salaries, we should pay to everyone, but first to the ones we have paid the least."

20.  On October 7, 2009, Velez e-mailed Morey, stating "[w]e will not be able to catch up with deferred payroll and other payments until we reach revenues of over $2 mill. Per month which I anticipate will be sometime in November."

21.  On October 29, 2009, Morey sent Montemayor an e-mail stating that he had had to sell part of his IRA to pay bills, and explaining the consequences if he did not replace that money by November 1.  Montemayor responded the next day, saying "[s]orry,

but it seems that we are still a couple months away from being able to 'catch-up' with accrued salaries payable to employees...."

22.  On November 12, 2009, Morey sent Montemayor an e-mail asking "[d]o you want me to write 1/2 payroll, or full this week??"  Montemayor responded "[l]et's continue with one half."  Montemayor also advised Morey on that date to "Pls. coordinate with Shelly regarding this next payroll payment, as it may be that Paycom is ready to make the payment instead of your cutting the check.  Pls. confirm outcome."

23.  On November 30, 2009, Shelly e-mailed Morey to "continue to issue payroll checks through the end of the year," and that "we are going to start with the first payroll of the year to process payroll" with "another payroll processor, Pay Choice."

24.  On December 1, 2009, Morey e-mailed Montemayor asking "[d]o I continue 1/2 pay or full pay this week."  Montemayor responded "[l]et's do 1/2 pay.  I'll keep you posted about the date when we can go back to full pay."

25.  On December 14, 2009, Montemayor sent Morey an e-mail stating "[w]e need to continue with the 50% paycheck methodology for now.  It seems that the 'catch-up' of past salaries will be next year when we receive some of the major funding, which I hope will take place during the first quarter."

26.  On May 18, 2010, IGNIA Fund I, LP, a venture capital fund, announced an investment of $5,000,000 in COH, as "part of a

US$6.5 million equity financing round that includes a US$1.5 million investment from existing shareholders."

27.   In early June, 2010, Velez had a conversation with Morey in which he alluded to possible bankruptcy, which worried Morey because he had so much deferred salary and insurance reimbursement on the books.  Morey testified that he felt like, after he had "set it all up," that defendants "were done with us" and we were being "pushed out the door."  Without checking first with Montemayor or Velez, on June 30, 2010, Morey wrote checks to himself totaling about $29,487.20, and to Harris checks totaling $23,047.10. He advised Montemayor that day that he had written these checks to cover "payroll owed" for February through June, 2010.

28.   On July 15, 2010, Velez sent Morey a letter terminating his employment for writing the checks to himself and Harris.  He stated that the termination was based on paragraph 7.A.2. of the Employment Agreement, "as your actions constitute a willful breach of duty."  Paragraph 7.A.2. allows COS to terminate Morey "for just cause, including, but not limited to, any willful breach of duty" in the course of his employment.

29.   Harris was also terminated by letter from Velez on July 15, 2010, the reason given being that "Chiapas Farms is reorganizing its efforts in the United States and your services are no longer required."  COS and COH eventually entered into a

settlement with Harris regarding his claims for deferred compensation.

30. During his employment, Morey's payroll checks were drawn on a COS account, but he used a COH credit card to charge business expenses. He was a signatory on bank accounts held by both COS and COH, and frequently authorized wire transfers of funds belonging to both entities.

31. At the time of his termination Morey was owed $118,599.00 in deferred salary and unpaid vacation, and $3,775.81 in deferred insurance reimbursements. He also claims 30 days' salary ($18,333.33) for the notice period for termination without cause, and the value of 176,000 shares of COH stock that did not vest. In addition to these amounts, specified in the Employment Agreement, he seeks consequential damages in the amount of $7,962.49 for interest on credit cards used to charge living expenses while his salary was deferred, and $4,544.00 in penalties resulting from the liquidation of his IRA during that same period.

32. The damages claimed by COS on its counterclaim are the amounts of the checks written by Morey to himself and Harris; taxes related to those checks, and the costs of settlement with Harris, which Montemayor testified was "triggered" by Morey's payments to Harris when defendants were hoping to pay Harris in stock.

ANALYSIS

33. Having already determined that defendants breached the Employment Agreement by deferring Morey's salary and insurance reimbursements, and that Morey is entitled to damages, the Court turns first to the issue of how much is due.

At the time of his termination, and taking into account the checks Morey wrote to himself, Morey was owed $118,599.00 in deferred salary and unused paid vacation, and $3,775.81 in deferred insurance reimbursements. He is entitled to recover these amounts.

34. Morey also claims 30 days' salary, $18,333.33, for the notice period for termination without cause, and the value of 176,000 shares of stock that did not vest. The Court is not persuaded that he is entitled to these items of damages.

Entitlement to these items depends on Morey being terminated without cause. It is clear that the policy of COS and COH, from mid-2009 until the date of Morey's termination, was to defer a portion of his and Harris' salaries, as well as the salaries of other executives. It is also clear that the issuance of payroll checks had been delegated to a payroll service in January, 2010. Morey was aware of these policies, and during the time he wrote payroll checks he consulted regularly with Montemayor before writing any checks for salary or insurance reimbursement to himself or Harris.

Morey did not, however, consult with Montemayor or anyone else in COS or COH before writing the payroll checks to himself and Harris in June, 2010. Given the precarious financial position of the companies, Morey's awareness that salary deferments were considered necessary, and the fact that payroll checks were at that time being issued by a payroll service, his unauthorized writing of these salary checks justified COS and COH in terminating him for cause.

35. Morey also seeks consequential damages in the amount of $7,962.49 for interest on credit cards used to charge living expenses, and $4,544.00 in penalties resulting from the liquidation of his IRA. The Court does not find any basis to allow recovery of these items of damage.

As explained by the Arkansas Supreme Court,

> [c]onsequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach. . . . In order to recover consequential damages in a breach-of-contract case, a plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff. It must also appear that the defendant at least tacitly agreed to assume responsibility.

**K.C. Properties of N.W. Arkansas, Inc. v. Lowell Investment Partners, LLC**, 373 Ark. 14, 24, 280 S.W.3d 1, 11 (Ark. 2008) (internal citations omitted).

There is no evidence that COH or COS tacitly agreed to assume responsibility for the interest on Morey's credit cards or his IRA

-12-

penalties, making these items unrecoverable.

36. The Court must next determine who is liable for Morey's damages. The tripartite Employment Agreement is curiously silent as to who is responsible for funding Morey's salary, but it makes COS responsible for providing him and his family with insurance. It requires no analysis or interpretation, therefore, to conclude that only COS is liable for the $3,775.81 in deferred insurance reimbursements.

37. The salary issue is more complex. While ordinarily one's employer pays one's salary, the circumstances here call that usual practice into question. The Employment Agreement placed responsibilities on Morey toward both companies, and provided for various types of remuneration for his services. It spelled out which company was liable for many of these types of remuneration, but was silent as to which company was responsible for payment of salary. Under these circumstances, the document is ambiguous -- either, or both, of the entities could have been responsible for payment of salary. "A contract's language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one equally reasonable interpretation." **Lynn v. Wal-Mart Stores, Inc., 102 Ark. App. 65, 71, 280 S.W.3d 574, 579 (Ark. 2008)**

38. When a contract is ambiguous, "extrinsic evidence is permitted to establish intent of the parties, and the meaning of

-13-

the contract then becomes a question of fact." **Vogelgesang v. U.S. Bank, N.A.**, 92 Ark. App. 116, 120, 211 S.W.3d 575, 578 (Ark.App. 2005).

> In determining the intent of the parties,
>
> the courts may consider and accord considerable weight to the construction of an ambiguous contract . . . by the parties themselves, evidenced by subsequent statements, acts, and conduct. Courts may also acquaint themselves with and consider circumstances existing at the time of the execution of a contract and the situation of the parties who made it.

**Deltic Timber Corp. v. Newland**, 2010 Ark. App. 276, 10, --- S.W.3d ---, **2010 WL 1233471 (Ark.App. 2010)** (internal citation omitted).

In addition, the doctrine of *contra proferentum*, recognized by Arkansas courts, "require[s] that if uncertainty or ambiguity exists within the terms of a contract, or if it [is] susceptible to more than one reasonable construction, then the courts must construe the contract most strongly against the party who drafted it." **Price v. Willbanks**, 2009 Ark. App. 849, 6, --- S.W.3d ---, **2009 WL 4840028 (Ark. App. 2009)**.

39. Applying the foregoing precepts to the evidence, the Court finds that both COH and COS are liable under the Employment Agreement for the payment of Morey's salary. Morey was involved in the development of both companies "from the ground up," performing services for both of them. He was a signatory on the bank accounts of both companies, and frequently transferred money between their bank accounts. Some of these transfers were for the

purpose of putting money from the COH account into the COS account to make payroll at COS.

While COS issued Morey's paycheck, COH furnished his credit card. Morey frequently received directions as to how to conduct business from Montemayor, who was an executive only of COH, as well as Velez, who was President of both companies. Morey's efforts were designed and intended to benefit both companies, anad he was required under the Employment Agreement to protect the business interests of both companies.

When these facts are construed in favor of Morey and against COH and COS, the Court concludes that both COS and COH were responsible for funding Morey's salary, and are liable for damages measured by unpaid salary on Morey's breach of contract claim.

40. COS asserted three counterclaims. It contended that by writing the June 30, 2010, payroll checks to himself and Harris, Morey breached his fiduciary duty to COS; converted funds belonging to COS; and breached the Employment Agreement.

The breach of contract claim is without merit, resting as it does on defendants' theory that they modified the Employment Agreement with regard to deferred salary, an argument that was rejected by the Court in its Order of March 1, 3012, granting Morey partial summary judgment.

The conversion claim is likewise without merit. "Conversion is a common-law tort action for the wrongful possession of

another's property. The tort of conversion is committed when a party wrongfully commits a distinct act of dominion over the property of another that is inconsistent with the owner's rights." **Schmidt v. Stearman**, **98 Ark. App. 167, 173-74, 253 S.W.3d 35, 41 (Ark. App. 2007)** (internal citation omitted). Morey's action in writing the payroll checks to himself and Harris resulted in the transfer of monies owed by defendants to himself and Harris, and is not consistent with the definition of conversion.

41. Morey was Vice President, U.S. Operations, of COS, and as such, owed the company a fiduciary duty to act in good faith, with ordinary care, and "in a manner he reasonably believes to be in the best interests of the corporation." **Wal-Mart Stores, Inc. v. Coughlin**, **369 Ark. 365, 370, 255 S.W.3d 424, 428 (Ark. 2007)**.

Given the evidence outlined in ¶¶ 15-27, the Court finds that Morey did not reasonably believe he was acting in the best interests of COS when he wrote the payroll checks to himself and Harris on June 30, 2010. Notwithstanding this finding, there is no evidence that the writing of these checks actually damaged COS. Montemayor's testimony that it "triggered" the costs of settlement with Harris, when defendants were hoping to pay Harris in stock, is nothing more than speculation.

In the absence of damages, there is no basis for awarding judgment to COS on this claim. As outlined in **AMI 1512**, damages is an essential element of the cause of action. The Court finds,

therefore, that COS is not entitled to any recovery on its counterclaims.

42. For reasons set forth in this Memorandum Opinion, the Court finds that Morey is entitled to judgment against COS in the sum of $3,775.81, and to judgment jointly and severally against COS and COH in the sum of $118,599.00.

The Court further finds that the counterclaim of COS against Morey should be denied and dismissed.

Judgment in accordance with these findings will be entered concurrently herewith.

**IT IS SO ORDERED**, this 11th day of April, 2012.

                                                    /s/ Jimm Larry Hendren  
                                                   **JIMM LARRY HENDREN**  
                                                   **UNITED STATES DISTRICT JUDGE**